UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Maryelizabeth C. Tardiff</u>


  v.        Civil No. 11-cv-17-JD
             Opinion No. 2012 DNH 053

<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>


O R D E R


  Maryelizabeth C. Tardiff filed a complaint, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration, denying her application for Supplemental Security Income benefits.[1]  Tardiff moves to reverse and remand the decision for further administrative proceedings.  The Commissioner objects to Tardiff's motion, contending that the Administrative Law Judge ("ALJ") did not err by allowing the medical expert to testify by telephone and that substantial evidence supports the decision.

---

  [1]Tardiff cites to Part 404 of Title 20, while the Commissioner cites, and the ALJ cited in his decision, Part 416 of Title 20.  "Part 404 of Title 20 regulates Disability Insurance, which is available to those who have paid social security taxes for the required period; Part 416 regulates Supplemental Security Income, which applies if a claimant has not paid the requisite taxes." <u>Mills v. Apfel</u>, 244 F.3d 1, 2 n.1 (1st Cir. 2001).  Because Tardiff is seeking only Supplemental Security Income benefits, Part 416 applies here.

Background

The parties' joint factual statement shows that Tardiff applied for Supplemental Security Income benefits on May 2, 2007, when she was twenty-five years old.  She had previously worked in 2007 for nine months as a cashier at the service desk at Building 19, Inc. and then at Dunkin Donuts, but quit the Dunkin Donuts job after two days because of conflict with a coworker.  She alleged that she was disabled primarily by mental disabilities due to post-traumatic stress disorder, major depressive disorder, and borderline personality disorder.  She also had been diagnosed with Hepatitis C.

Medical Records

Tardiff was treated at Merrimack River Medical Services in 2006 and 2007 where she reported that she was taking street methadone.  She was diagnosed with opiate dependency, dysthymia, and hepatitis.  She was assessed to have a Global Assessment of Functioning ("GAF") score of 50.[2]

---

[2]GAF "evaluates overall psychological functioning on a scale of 0-100 that takes into account 'psychological, social, and occupational functioning.'"  <u>Washington v. Astrue</u>, 2011 WL 4407432, at *1, n.3 (D. Mass. Sept. 20, 2011) (quoting <u>American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders</u>, at 32 (4th ed. rev. 2000)).  A GAF score between 41 and 50 "reflects serious symptoms or any serious impairment in social, occupational, or school functioning."  <u>Id.</u>

In May of 2007, Tardiff met with Sheryl Wood, M.S.W., at Manchester Community Health Center.  Tardiff told Wood that she was pregnant and had stopped taking methadone.  She then began receiving prenatal care at the Health Center.  Tardiff also sought mental health treatment and met with Gavin Muir, M.D., on May 22, 2007.  Tardiff had a baby at Elliot Hospital, in Manchester, on January 8, 2008.  She did not return to the Health Center after the baby was born.

Tardiff met with Peter J. Taylor, LICSW, at Bedford Counseling Associates on May 20, 2008.  Taylor assessed Tardiff to have a normal mental status examination except for "tangential but redirectable thoughts."  Taylor diagnosed a mood disorder with a GAF score of 50.  Tardiff was treated at the Elliot Hospital emergency room for lacerations to her hand on May 31, 2008, which were the result of punching her hand through a window because she was mad at her boyfriend.[3]

On June 4, 2008, Tardiff had a psychotherapy session with Taylor.  She reported to Taylor on June 19 that her mood and

---

(internal quotation marks omitted).  A GAF score between 51 and 60 indicates moderate symptoms, and a score between 61 and 70 reflects some mild symptoms.  Id.

[3]Although the parties' joint factual statement says that Tardiff met with Taylor after the incident with her hand, the medical records show that the hand incident occurred after her meeting with Taylor.

sleep had improved with medication but she still had emotional episodes and felt a loss of control when dealing with family members.  Taylor noted unremarkable mood or affect, unremarkable thought processes, and unremarkable behavior or functioning.  On June 5, 2008, Michelle Gunning, M.D., a staff psychiatrist at Mental Health Center of Greater Manchester, assessed Tardiff with goal directed thought processes, intact memory, fair attention and concentration, depression, and anxiety.  Dr. Gunning found a GAF score of 50.

On June 25, 2008, Tardiff had a liver biopsy due to concerns about Hepatitis C.  The results of the biopsy were positive.  Tardiff experienced complications from the biopsy because a blood vessel was punctured during the procedure.  Her treating doctor noted that she was suffering depression and anxiety and advised Tardiff to continue to take Celexa and Trazadone.

Tardiff was evaluated at the Mental Health Center on August 11, 2008.  She was diagnosed with post traumatic stress disorder, opiate dependence, and borderline personality disorder.  She was assessed in the severe range for depression and had a GAF score of 40.

The Social Security Administration requested a consultative examination, which was done on August 13, 2008, by Darlene R. Gustavson, Ph.D.  Dr. Gustavson found that Tardiff's thoughts

were sometimes loosely associated and paranoid but could be redirected and that Tardiff's insight and judgment were limited. She assessed an average intellectual functioning. Dr. Gustavson diagnosed post traumatic stress disorder, recurrent and severe major depressive disorder with psychotic features, and borderline personality disorder. With respect to functioning, Dr. Gustavson stated that Tardiff could not understand or remember instructions, was not able to interact appropriately with others, was not able to sustain attention or complete tasks, and was not able to tolerate common work stress.

On September 22, 2008, a psychologist from the Disability Determination Service, J. Coyle, reviewed Tardiff's records and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Evaluation form based on his review alone. Dr. Coyle found that Tardiff had moderate limitations in her ability to understand and remember detailed instructions, to maintain attention and concentration, to perform activities within a schedule including attendance and punctuality, to work with or near others, to complete a work day and week without an unreasonable number of interruptions due to psychological symptoms, to act appropriately with the public and supervisors, to get along appropriately with coworkers, to respond appropriately to changes in the work place, and to set realistic

goals.  Despite her moderate limitations, Dr. Coyle concluded
that she could understand and remember short routine
instructions, sustain attention and effort with an acceptable
pace, have brief or casual interactions with the public, interact
appropriately with coworkers and supervisors in a work setting,
maintain grooming and hygiene, and tolerate routine stress and
adapt to minor changes in a work setting.

On August 26, 2009, Tardiff's treating psychiatrist, Dr.
John Palmieri, completed a mental functional capacity evaluation
report.[4]  Dr. Palmieri wrote that based on reports about
Tardiff's work experiences, he thought that she was unable to
meet the competitive standards for doing unskilled work because
she could not maintain attention for a two-hour period, could not
maintain regular attendance or punctuality, could not work with
or near others without being unduly distracted, could not
complete a work day or week without interruptions due to
psychological symptoms, could not accept instruction or respond
appropriately to criticism, could not get along with coworkers,
and could not respond appropriately to changes in the work place.
Dr. Palmieri also found that Tardiff was not precluded from
working but was severely limited in her ability to make work

_____

[4]In their memoranda, the parties spell the name "Palmeri."
The medical records, however, show the name as "Palmieri."

related decisions, perform at a consistent pace, and deal with normal work stress.

Tardiff was treated at the Mental Health Center of Greater Manchester through December of 2009.  She was diagnosed with post traumatic stress disorder, anxiety, and depression with a variety of symptoms.  She was prescribed medication that was changed several times.  During that time, she was assessed with GAF scores generally in the 50s.

Tardiff was admitted to the Cypress Center on November 26, 2009, and was held overnight because of suicidal thoughts.  The record noted that Tardiff considered overdosing on medications and had experienced increased depression, anxiety, and panic attacks.  She had also had financial problems.  Tardiff was homeless and felt overwhelmed.  She was diagnosed with post traumatic stress disorder, cocaine dependence, borderline personality disorder, and a GAF score of 30.

Following treatment at the Cypress Center, Tardiff saw Dr. Palmieri on December 16, 2009.  Dr. Palmieri noted that Tardiff was feeling overwhelmed by her responsibilities for her young son, that she had stopped her medication briefly, and that she then felt better but was still struggling with anxiety, motivation, energy, and desire.  Dr. Palmieri assessed a GAF score of 56.  When Tardiff saw Dr. Palmieri in January of 2010,

his diagnoses and GAF score were unchanged.   Tardiff also
participated in group therapy and parenting classes through
December and into January of 2010.

Administrative Proceedings

After Tardiff's application for Supplemental Security Income
benefits was denied on September 26, 2008, she requested a
hearing before an ALJ.   A hearing was held on April 13, 2010, and
a subsequent hearing was held on July 20, 2010.   The notice for
the first hearing stated that Gerald Koocher, Ph.D. would testify
as a medical expert but did not specify the means by which he
would testify.   At both hearings, Dr. Koocher testified by
telephone.   Tardiff's counsel objected to telephonic testimony.
Tardiff was represented by counsel and testified at the April 13,
2010, hearing.   Tardiff's mother, Susan Tardiff; a vocational
expert, John Bopp, and Dr. Koocher also testified at the hearing.
Only Dr. Koocher testified by telephone.

Concerning her prior work history, Tardiff testified that
she had worked at Building 19 as a cashier and at the service
desk but was demoted because she could not handle the job
requirements.   She testified that she thought the main supervisor
was "out to get her," that she had stopped methadone because she
was pregnant, and that she quit the job while she was on sick

leave.  She returned to the job briefly but felt unsafe around
her coworkers and people in general.  Tardiff then sought mental
health treatment.

Tardiff testified about the medications she was taking.  She
explained that her post traumatic stress disorder arose from
having been sexually molested by a friend's brother from the time
she was nine years old until she was twelve.  In describing her
ability to function, Tardiff testified that she had a hard time
remembering things, difficulty overcoming anxiety even to go to
scheduled medical appointments, and serious issues with other
people, including her family, because of her perceptions of what
people might be thinking.  She also described difficulty with
concentration and attention, with panic attacks, and with
regularly visiting her twin daughters who were being raised by
her mother.

Susan Tardiff, Maryelizabeth Tardiff's mother, testified
that she had physical custody of her twin granddaughters.  Susan
said that her daughter, whom she calls Mary, had always had
problems but that her problems became severe during her teenage
years.  Susan said that she learned of the sexual abuse when Mary
was a teenager.  Susan said that Mary could not deal with stress,
that she had problems remembering and understanding things, and
that she misinterpreted what people said.  She reported that Mary

had tried, but was unable, to attend college in 2007. Susan testified that Mary was unable to concentrate and sustain attention, that she could not reliably take care of her daughters, and that she had demonstrated unpredictable paranoid behavior since May of 2008.

Dr. Koocher testified based on his review of Tardiff's medical records. He noted that the records were inconsistent and that the opinions and results varied widely. Dr. Koocher testified that Dr. Palmieri's opinions were based on Tardiff's subjective reports rather than on examination or testing results, that Dr. Gustavson's opinions were not supported by the other medical records, and that Dr. Coyle, the nonexamining state agency psychologist, noted the same problems with Dr. Gustavson's report. Dr. Koocher agreed that the records supported diagnoses of depression and borderline personality disorder but was less sure about post traumatic stress disorder. He interpreted the medical records to support only a moderate level of impairment.

Tardiff's medical records for the period between December 4, 2009, and January 25, 2010, for treatment with Dr. Palmieri and at the Cypress Center were provided to Dr. Koocher after the hearing. Dr. Koocher reviewed the records and prepared a report in which he stated that Tardiff's symptoms fit three listed impairment categories but were generally at a severity level of

moderate, not severe.  Dr. Koocher stated, based on his interpretation of the record, that Tardiff could work with continued medication and treatment to help improve her interpersonal skills.

The second hearing was held on July 20, 2010, and Dr. Koocher again testified by telephone.  A vocational expert, Gerald Bopp, also testified.  Dr. Koocher stated that the additional medical records had not changed his opinions.  Dr. Koocher testified that Tardiff would be able to work in jobs that required only routine tasks and limited contact with the public.

The ALJ posed a hypothetical question to the vocational expert that described a person with Tardiff's education, the ability to do only routine tasks, and with a need for only limited contact with the public.  The vocational expert testified that there were several jobs that person could perform.  When the ALJ added the moderate limitations found by Dr. Coyle in the Mental Functional Capacity Evaluation he completed, the vocational expert said that the limitations, although moderate, would limit productivity and the acceptability of critical vocational behaviors.  As a result, the vocational expert gave his opinion that a person with those limitations would not be able to maintain work for very long.  In response to hypothetical questions that incorporated the limitations found by Dr.

11

Gustavson and those found by Dr. Palmieri, the vocational expert said that no jobs existed in the competitive labor market that could be performed with those limitations.  The ALJ asked another hypothetical question that incorporated a description provided by Dr. Coyle, and the vocational expert responded that jobs existed that such a person could perform.

The ALJ issued his decision on August 17, 2010.  He found that Tardiff had a residual functional capacity to do a full range of work at all exertional levels but was limited to routine tasks and jobs that required only limited contact with the public.  Based on the vocational expert's testimony, the ALJ found jobs existed that Tardiff could do and that she was not disabled.  The Decision Review Board affirmed the ALJ's decision.

## Discussion

Tardiff contends that the ALJ erred in allowing Dr. Koocher to testify by telephone, erred in assigning little weight to the opinions of Tardiff's treating and examining sources, and erred in assessing her credibility.[5]  The Commissioner moves to affirm the decision on the grounds that the telephone testimony was at most harmless error, that the ALJ properly weighed the medical

---

[5]An issue about a missing part of the hearing transcript has been resolved.

opinions, and that substantial evidence supports the ALJ's
credibility determination.  Tardiff filed a reply to address the
issue that had become moot and the telephone testimony.

     In reviewing the final decision of the Commissioner in a
social security case, the court "is limited to determining
whether the ALJ deployed the proper legal standards and found
facts upon the proper quantum of evidence."  Nguyen v. Chater,
172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's
factual findings as long as they are supported by substantial
evidence.  § 405(g).  "Substantial evidence is more than a
scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion."  Astralis
Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62,
66 (1st Cir. 2010).


A.   Testimony by Telephone

     Dr. Koocher testified by telephone at both hearings.
Tardiff objected to telephonic testimony, but the ALJ overruled
her objections.  Tardiff contends that she was prejudiced by the
telephonic testimony because Dr. Koocher could not observe
Tardiff during the hearings, because Dr. Koocher could not be
cross examined in person, and because the transcript of his
testimony includes inaudible notations.  The Commissioner

13

contends that telephonic testimony is allowed and that even if it were improper, any error was harmless.

The applicable social security regulations provide for testimony in person or by video teleconferencing.  20 C.F.R. § 416.1450(e) ("Witnesses may appear at a hearing in person or, when the conditions in § 416.1436(c) exist, video teleconferencing.").  The regulations do not address testimony by telephone.  The Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") states that the preferred methods for an expert to testify are in person, by telephone, or by video teleconference.  HALLEX I-2-5-30, 1994 WL 637367.  The few cases to have addressed the question of the use of telephonic testimony have arrived at different outcomes based in part on the particular circumstances presented.

In Ainsworth v. Astrue, 2010 WL 2521432, at *2-*3 (D.N.H. June 17, 2010), the court concluded that the medical expert's testimony by telephone required the case to be remanded because the opinion was critical to the ALJ's decision, the transcript of his testimony was incomplete in important sections, and the use of telephonic testimony is not always appropriate.  Conversely, in Goodwin v. Astrue, 2011 WL 1630927, at *11 (D.N.H. April 11, 2011) (report and recommendation approved on April, 29, 2011), the court held that telephonic opinion testimony did not require

14

remand because the plaintiff failed to object or show resulting prejudice, the regulations and the HALLEX provisions do not conflict, the First Circuit has not barred telephonic testimony, and the Eighth Circuit allowed telephonic testimony.  The Eighth Circuit, in Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008), noted that testimony by telephone in a social security hearing did not violate due process but concluded that the applicant had waived the issue.  The District of Connecticut requires notice to a social security applicant and her consent before a medical opinion can be taken by telephone at a hearing.  Morlando v. Astrue, 2011 WL 4396785, at *6 (D. Conn. Sept. 20, 2011) (citing Edwards v. Astrue, 2011 WL 3490024, at *7-*10 (D. Conn. Aug. 20, 2011)).  In Cassidy v. Astrue, 2011 WL 4102824, at *13 (N.D. Fla. Aug. 9, 2011) the court relied on Hepp and concluded that the ALJ did not err by allowing telephonic medical opinion testimony.

In this case, Tardiff objected to Dr. Koocher's testimony by telephone, and therefore the issue was not waived.  She asserts that telephonic testimony is improper because it is not authorized by social security regulations and that she was prejudiced by the telephonic testimony because "Dr. Koocher could not observe [Tardiff] at the hearing and could not be cross examined in person."  She relies on Edwards, 2011 WL 3490024, to support a right to in-person testimony.

15

Unlike the District of Connecticut, this district has not adopted a rule that telephonic testimony cannot be used in a social security hearing when the applicant objects.  Instead, this court will consider the circumstances to determine whether telephonic testimony prejudices the claimant.  See Hepp, 511 F.3d at 805-06; see also Goodwin, 2011 WL 1630927, at *11; Ainsworth, 2010 WL 2521432, at *2-*4.  The decision in Edwards is neither controlling nor persuasive in this case.

As other courts have determined, use of telephonic opinion testimony does not violate social security regulations that specify testimony in person or by video teleconferencing.  See, e.g., Goodwin, 2011 WL 1630927, at *11.  To show that her case must be remanded, Tardiff must point to evidence that she was prejudiced by Dr. Koocher's telephonic testimony.  For that purpose, Tardiff contends that the ALJ relied heavily on Dr. Koocher's opinions and argues that she was prejudiced because Dr. Koocher did not have the complete record at the first hearing, which could have been remedied if he had appeared in person.  She argues that the hearing was unnecessarily interrupted because of the missing records.  She also notes that the transcript of the first hearing includes some inaudible gaps in his testimony.  In addition, she contends that telephonic testimony precluded an

opportunity for Dr. Koocher to observe her during the hearings and for face to face cross examination.

With respect to the incomplete record during the first hearing, Tardiff acknowledges that Dr. Koocher was provided with the missing records and that he had all of her medical records before the second hearing.  Although the missing records required a second hearing, Tardiff does not explain what, if any, harm that caused to her except to say that "the flow of the testimony and cross-examination was unnecessarily interrupted" by the need for the missing records.  Tardiff does not explain how an interruption in the "flow" of the hearing negatively impacted her case.  In fact, at the second hearing Tardiff's counsel had another opportunity to cross examine Dr. Koocher.  Tardiff has not shown prejudice due to the initially incomplete record that required a second hearing.

Tardiff also contends that four inaudible gaps in the transcript of the first hearing prejudiced her.  Unlike the circumstances in Ainsworth, however, Tardiff does not show or even suggest that the inaudible gaps in this transcript interfere with understanding Dr. Koocher's opinions or the bases for his opinions.  Instead, it appears, and Tardiff does not argue otherwise, that the inaudible gaps indicate only a word or two which are not critical to Dr. Koocher's opinions.

17

The Association of Administrative Law Judges has objected to conducting hearings by telephone because "'[a] telephone hearing adversely affects the ability of the administrative law judge to ascertain the identity of the participants and to determine the credibility of either the claimant or the witnesses because their demeanor cannot be observed by the judge.'" <u>Ainsworth</u>, 2010 WL 2521432, at *4 (quoting <u>Comments of the Association of Administrative Law Judges Regarding Social Security Administration Notice of Proposed Rulemaking</u> (Oct. 29, 2007)). In this case, Tardiff has not explained how Dr. Koocher's testimony by telephone impaired her case.  It is not apparent that the ALJ should have seen Dr. Koocher in person to evaluate his credibility or demeanor.  Tardiff also has not shown what benefit she would have had if Dr. Koocher had been able to observe her during the hearing.

In the absence of unfairness or prejudice, Tardiff has not shown that the ALJ erred in allowing telephonic testimony.

B.  <u>Weight Given to Medical Opinions</u>

Tardiff contends that the ALJ erred in giving little or no weight to the opinions of her treating psychiatrist, Dr. Palmieri, and the consulting examining psychologist, Dr. Gustavson, in favor of the contrary opinions provided by the

18

Commissioner's psychologist medical expert, Dr. Koocher.  The
Commissioner asserts that he may give the opinion of an
independent medical expert, who is retained by the Commissioner,
greater weight than other opinions, that an independent medical
expert's opinion is substantial evidence, and that the ALJ
properly weighed the various medical opinions.

Under the social security regulations, the ALJ attributes
weight to a medical opinion based on the nature of the
relationship between the medical provider and the claimant.  20
C.F.R. § 416.927(d).  An opinion based on one or more
examinations is entitled to more weight than a non-examining
source's opinion, and a treating source's opinion, which is
properly supported, is entitled to more weight than other
opinions.  Id.  A treating source's opinion on the nature and
severity of the claimant's impairments will be given controlling
weight if the opinion is "well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in [the] case
record."  § 416.927(d)(2).  "If any of the evidence in [the
claimant's] case record, including any medical opinion(s), is
inconsistent with other evidence or is internally inconsistent,
[the ALJ] will weigh all of the evidence and see whether [he] can

decide whether you are disabled based on the evidence we have."
§ 416.927(c)(2).

In addition to the medical evidence provided by the
claimant, an ALJ may obtain an opinion from a medical expert
about the nature and severity of the claimant's impairments.
§ 416.927(f)(2)(iii).  In appropriate circumstances, the opinions
of a medical expert retained by the Commissioner may be given
greater weight than other opinions.  Keating v. Sec'y of Health &
Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988); see also SSR
9.  The ALJ uses the same evaluation process that is used for all
medical opinions to decide the weight of opinions he has
commissioned.  § 416.927(f)(2)(iii); Kelly v. Comm'r of Soc.
Sec., 2011 WL 4484149, at *10 (S.D. Ohio Aug. 4, 2011); Cooper v.
Astrue, 2011 WL 2748642, at *4 (W.D. Okla. June 20, 2011).

In his decision, the ALJ gave the greatest weight to Dr.
Koocher's opinions about Tardiff's overall functioning.  The ALJ
explained that Dr. Koocher reviewed the entire record, that he
supported his opinions with references to the record of Tardiff's
symptoms, signs, and descriptions of functioning over a long
period of time, and that a lack of treatment since January of
2010 supported Dr. Koocher's opinion of Tardiff's level of
functioning.  The ALJ also adopted Dr. Koocher's criticisms of
the opinions of Dr. Palmieri and Dr. Gustavson.

20

1.  Dr. Palmieri

With respect to Dr. Palmieri, the ALJ stated, based on Dr.
Koocher's review, that his opinions were entitled to little
weight because they were based on Tardiff's reports not on Dr.
Palmieri's own observations or testing and because Dr. Palmieri
expressly noted that basis for his opinions three times on the
evaluation form.  In response, Tardiff contends that Dr.
Palmieri's opinions were not based entirely on Tardiff's reports.
Tardiff cites Dr. Palmieri's diagnosis of post traumatic stress
disorder and the correlation between the stated symptoms of that
disorder and Tardiff's report of her symptoms.  She argues that
the diagnosis was a medical finding that was not based entirely
on her self report of symptoms.  She cites Dr. Koocher's
testimony that Dr. Palmieri's diagnosis was based on a mix of his
own observations and Tardiff's self reporting.

Dr. Koocher was correct that Dr. Palmieri added notations on
the evaluation form that he completed in August of 2009.  With
respect to his evaluation of Tardiff's mental abilities and
attitudes, Dr. Palmieri noted: "Unable to assess directly at work
sites.  Based on client's report."  In response to the questions
about Tardiff's ability to do skilled and semi-skilled work, Dr.
Palmieri wrote that Tardiff reported a history of absenteeism at
work and other problems in work settings.  His evaluation of

21

Tardiff's abilities to do particular types of jobs also included the notation that he was "unable to observe directly.  Based on client report."  Therefore, Dr. Koocher correctly observed that Dr. Palmieri's opinions about the level of Tardiff's functioning were based on her self reports and not on his own observations or testing.

Tardiff argues that the ALJ erred in failing to interpret Dr. Palmieri's treatment notes that contain additional information about her diagnosis and symptoms.  The ALJ, however, was not qualified to interpret raw medical data in functional terms.  Nguyen, 172 F.3d at 35.  Instead, the ALJ relied on Dr. Koocher's interpretation of the medical record.  Dr. Koocher focused on Dr. Palmieri's opinions as expressed in his evaluation form.

Tardiff's statement that it was improper to disregard self reports in the context of a mental disability is not supported by any competent record evidence.  Based on the record, the ALJ properly relied on Dr. Koocher's opinion about the validity of Dr. Palmieri's evaluation.

2.  Dr. Gustavson

The ALJ noted that he had considered Dr. Gustavson's evaluation of Tardiff but found it wanting because, as Dr.

22

Koocher noted, it lacked a GAF score and because the level of functioning assessed was inconsistent with Dr. Gustavson's observations about Tardiff's activities.  Tardiff challenges the ALJ's analysis on the grounds that a GAF score is not required and that Dr. Gustavson's note about Tardiff's activities did not give a complete view of what Tardiff could and could not do without assistance.

Dr. Koocher noted the absence of a GAF score in Dr. Gustavson's assessment and testified that in traditional mental health practice, a practitioner gives a GAF score, also known as an Axis 5 diagnosis.  Dr. Koocher faulted Dr. Gustavson's assessment for failing to cite adequate data in the medical record to support her diagnoses and was not sure that Tardiff was properly diagnosed with post traumatic stress disorder due to the lack of related symptoms.  Dr. Koocher noted that the test results Dr. Gustavson obtained from Tardiff did not show the level of impairment that Dr. Gustavson reported.

Although other evidence in the record may show that Tardiff was more limited in her activities than she reported to Dr. Gustavson, the issue for purposes of evaluating Dr. Gustavson's opinion is its internal consistency and its consistency with other parts of Dr. Gustavson's records and the medical record as a whole.  Because Dr. Gustavson credited Tardiff's report of her

activities, Dr. Gustavson's assessment of more severe limitations was inconsistent with that part of the record.

Tardiff has not shown that the ALJ erred in relying on Dr. Koocher's evaluation of Dr. Gustavson's opinions.

3.  Dr. Koocher

Dr. Koocher testified that Tardiff could work in a job that required only routine and relatively simple tasks, no exposure to the public, and little interaction with fellow workers and supervisors.  The ALJ stated in his decision that he gave Dr. Koocher's opinion the greatest weight because Dr. Koocher had reviewed the entire record and "supported his opinion with reported symptoms, signs and descriptions of the claimant's functioning over an extended period of time."  Admin. Rec. 17. The ALJ also noted that the absence of medical records after January of 2010 adds further support for Dr. Koocher's opinions. Tardiff faults the ALJ for giving the greatest weight to Dr. Koocher's opinion without citing particular portions of his testimony that would support his conclusion.  Tardiff also argues that the lack of treatment records after January of 2010 should not have been interpreted to support Dr. Koocher's opinion.

 The weight given an opinion by a non-examining medical source depends on the explanation provided for the opinion and

24

the degree to which the medical source has considered the evidence in the record.  § 416.927(d)(3) & (6).  Tardiff does not dispute that Dr. Koocher cited the record to support his opinion. Therefore, the ALJ gave appropriate reasons for relying on Dr. Koocher's opinion.

A lack of evidence of treatment is relevant to the severity of a claimant's impairments and can support an inference that the claimant was not disabled.  See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769-70 (1st Cir. 1991); Kosinski v. Astrue, 2011 WL 3678836, at *4 (D. Mass. Aug. 19, 2011).  A gap in treatment may be justified, based on certain circumstances such as a lack of insurance and an inability to afford treatment. SSR 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *8 (July 2, 1996).  An ALJ must consider any explanation provided by the claimant as to why she did not seek treatment during any particular period of time.  Id. at *7.

Tardiff argues that the two-and-a-half-month gap from January until the first hearing in April of 2010 is not significant.  She also notes that there are reasons why a person might not seek treatment that would explain the gap.  Tardiff

does not suggest that any of the reasons applied to her or that she provided any explanation of the gap in treatment to the ALJ.

As the Commissioner notes, the last treatment record, for January 25, 2010, provides findings that are consistent with Dr. Koocher's opinion.  Although the first hearing was held in April of 2010, a second hearing was held in July, and the ALJ did not issue the decision until August of 2010.  Tardiff, who was represented by counsel, did not seek to augment the record with additional treatment evidence during that time.  See 20 C.F.R. § 405.331(c).  Indeed, Tardiff does not represent that she received any treatment during that time.  Therefore, the ALJ appropriately considered the lack of treatment as evidence that supported Dr. Koocher's opinion.

C.  Credibility

The ALJ found that Tardiff's statements about the intensity, persistence, and limiting effects of her symptoms were not credible to the extent her statements were inconsistent with her ability to work with the limitations identified by the ALJ.  In assessing a claimant's credibility, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *7.  As part of the assessment, an ALJ must evaluate a variety of

26

factors, including the characteristics of the medical problem, precipitating and aggravating factors, medication, other treatments, functional restrictions, and daily activities.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

Tardiff faults the ALJ's explanation of his credibility finding on the grounds that he failed to provide citations to the record in some instances, that other citations to the record do not support the ALJ's findings, and that the ALJ misstated the record.  While an ALJ is required to consider the entire record, Tardiff has not shown that an ALJ must also provide citations to parts of the record that support his findings on credibility. Several of Tardiff's objections are wrong, and the others are addressed as follows.[6]

Tardiff contends that the ALJ has misrepresented the record by stating that she had only two instances of a severe GAF score, when she had three GAF scores below 51.  As is explained by the Commissioner, the ALJ appears to have cited the wrong page in an exhibit in certain instances but the evidence in the record supports his findings.  Tardiff has not shown that the additional

---

[6]Contrary to Tardiff's objections, the part of the record the ALJ cited pertaining to attendance at appointments is on point, and Dr. Koocher's report is included in the "case record," which is what the ALJ is required to consider.

GAF score of 50 undermines the ALJ's findings, which took into consideration the other medical findings noted on the occasion of the GAF score of 50.  Similarly, any confusion in the length of Tardiff's stay at the Cypress Center, which arose an overnight stay, does not affect the evidence that supports the ALJ's findings.  A GAF score of 65 in January of 2010 supports the ALJ's reliance on the more positive aspects of the treatment notes from that appointment.

Substantial evidence supports the ALJ's credibility finding. While other evidence exists in the record, it is the province of the ALJ to make credibility findings, which when supported by substantial evidence, must be affirmed even if the reviewing court could have reached a different result.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Summers v. Astrue, 2011 WL 5508919, at *9 (D. Mass. Nov. 10, 2011).

<u>Conclusion</u>

For the foregoing reasons, the Commissioner's motion to affirm (document no. 18) is granted.  The claimant's motion to reverse and remand (document no. 14) is denied.

The clerk of court shall enter judgment accordingly and close the case.


SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

March 7, 2012

cc:  Robert J. Rabuck, Esquire
     Jeffry A. Schapira, Esquire